Enterprise Lumber Company, a corporation v. Commissioner.
Enterprise Lumber Co. v. Commissioner
Docket No. 2604.
United States Tax Court
1945 Tax Ct. Memo LEXIS 104; 4 T.C.M. (CCH) 824; T.C.M. (RIA) 45270; August 1, 1945
*104 1. The petitioner, a domestic corporation, was controlled by the same shareholder who controlled a foreign corporation. The petitioner received certain allowances from steamship lines by whom it shipped its lumber to Cuba. It entered these allowances on its books to the credit of the foreign corporation and claims that such allowances were the income of the foreign corporation under a contract executed by its agent with the steamship lines. Held: That the contract under which the allowances were paid and received by the taxpayer was executed by its agent, and that the allowances paid thereunder were received by the taxpayer as part of its gross income. 2. Held, further, that the taxpayer is not entitled to a deduction from gross income in the amount of the allowances received by reason of the fact that it credited them to the account of the foreign corporation, or on the theory that it paid them to its controlling shareholder as his compensation as president of the foreign corporation. 3. The taxpayer being on the accrual basis, and portions of the allowances having accrued in fiscal years prior to those in which such portions were included by respondent in his computation of *105 the deficiencies in such years, the amount of the allowances added in such computation to petitioner's gross income should be adjusted to reflect such prior year accruals. Walter E. Travers, Esq., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax, declared value excess-profits tax, and excess-profits tax for the fiscal years and in the amounts as set forth below: Fiscal Year
Declared Value
Excess Profits
Total
Ended
Income Tax
Excess-Profits Tax
Tax
Deficiency
5/31/40
$ 950.71
$ 950.71
5/31/41
936.84
$ 642.34
1,579.18
5/31/42
737.50
$746.19
2,070.37
3,554.06
TOTAL
$2,625.05
$746.19
$2,712.71
$6,083.95
*106 These deficiencies result from several adjustments, the only one of which contested by petitioner being respondent's inclusion in petitioner's gross income for each of the fiscal years of amounts (received by it) representing allowances from the Gulf and South Atlantic Havana Steamship Conference on lumber shipped by petitioner to Cuba. Findings of Fact The petitioner is a corporation existing under the laws of Florida with its principal place of business at 228 Hogan Street, Jacksonville, Florida. It was incorporated in 1933 and succeeded a business begun in 1901 at Enterprise, Mississippi. Its operations consist of the buying and selling of lumber at wholesale. The principal outlet for petitioner's domestic sales is the Yellow Pine Sales Corporation, located in Newark, New Jersey. About half its total sales are export sales to about 20 customers in the Republic of Cuba. Petitioner maintained a sales office located in Havana, Cuba. Its fiscal year ended on May 31 of each of the taxable years. It kept its books on the accrual basis and so reported its income. Petitioner's president is G. R. Olliphant, who owns all its capital stock, except three qualifying shares. G. R. Olliphant *107 is also president of the Havana Lumber Company, a Cuban corporation organized in 1925 and engaged until 1930 in the wholesale lumber business. He owned all its capital stock, but one qualifying share held in the name of his nominee, Luis Fernandez. About 1930 the Havana Lumber Company sold its operating assets to the General Lumber Company, a competing association of Spanish lumber wholesalers. The Havana Lumber Company agreed not to engage in competitive business for eight years. After the sale, its activities in connection with its former business consisted in efforts to collect about $100,000 of accounts receivable and to dispose of real estate acquired in settlement of its accounts. Until April 1938 petitioner's Cuban sales office was under the management of G. R. Olliphant's son, who also represented the Havana Lumber Company and G. R. Olliphant personally. The son, having been neglectful in his management, was temporarily replaced by a stenographer in the Cuban office who acted on phone or mail instructions from G. R. Olliphant. In May 1938 Olliphant employed Luis Fernandez to replace his son in Havana at a salary of $150 a month. Fernandez represented both corporations *108 and Olliphant personally as had Olliphant's son. He looked after 10,000 acres of land Olliphant owned in East Cuba. For the Havana Lumber Company, Fernandez took charge of its Havana office and remaining assets, and made collections on its remaining outstanding accounts. On one occasion he collected $6,000 for it on the sale of some of its real estate. Most of the services rendered by Fernandez were rendered to petitioner, and his substitution for Olliphant's son resulted in a "tremendous change" for the better in petitioner's business. He acted as petitioner's agent to receive and deliver lumber to the ultimate purchasers in Cuba. The invoices billing the shipments to the purchasers were sent to him and he made the collections thereon. He received the bills of lading and all shipping documents, and his handling of the lumber through the Cuban Customs proved a strong incentive to petitioner's customers to purchase petitioner's lumber. He checked the cars containing lumber shipments into the warehouse, and, in conjunction with the purchasers of the lumber, checked the lumber as required by Cuban law. He handled claims against the petitioner for shortages and when petitioner's shipments *109 were refused, he sold them to someone else for petitioner, and rebilled them. He solicited some orders for petitioner's lumber. He "helped out" petitioner whenever there was any other trouble. The Gulf and South Atlantic Havana Steamship Conference (hereinafter referred to as "Conference") located at 321 Charles Street, New Orleans, Louisiana, consists of the Florida East Coast Car Ferry Company, Seatrain Lines, Inc., Standard Fruit & Steamship Company, and United Fruit Company, performing common carrier service from ports of the United States to Cuba. The current basic freight tariff rate which all shippers, including petitioner, had to pay on lumber shipped to Havana, Cuba was $11.75 per 1,000 board feet, plus additional amounts varying from 1" to 12 1/2" per 100 pounds, depending on the port of origin. The published tariff of the carriers provided, however, that "(d) On shipments offered for transportation via New Orleans, La. and/or Port Everglades, Fla., in quantities of not less than 300,000 feet B.M. during any period of 15 consecutive days, to one consignee, an allowance of $2.50 per 1,000 feet B.M. will be made to any consignee who shall execute and abide by Conference *110 form of Lumber Consignees' Freighting Agreement." Olliphant tried to obtain such a "Lumber Consignees' Freighting Agreement" for petitioner or for himself, but the Conference would not consider such a contract because they stated it would be illegal, not only for the shipper, but also for the carrier. Olliphant then considered having such contract executed by the Havana Lumber Company, but was advised by counsel not to have the contract signed by that company, and that there was no necessity for it being in either his own name or the name of the Havana Lumber Company. The first Conference contract was then executed by Olliphant's son in his own name. After the son left Havana, the next contract was executed and signed by "Luis Fernandez Lumber Merchant". No contract was ever signed by the Havana Lumber Company. The contract with the Conference, executed December 28, 1938 by Luis Fernandez was headed "Lumber Consignees' Freighting Agreement" and contained, inter alia, the following provisions: "And Whereas, the Carriers have published in said conference tariff a provision for an allowance to consignees wishing to take advantage thereof and the Lumber Merchant hereby desires to do *111 so and is accordingly willing to enter into this agreement for such purpose; "Now, Therefore, in consideration of the premises and the mutual agreements hereinafter set forth, the parties hereto agree as follows "1. The Lumber Merchant shall cause all his importations into Cuba from the ports of New Orleans, Louisiana, and Jacksonville (Port Everglades), Florida, to be shipped exclusively on vessels of the Carriers and shall make such shipment a specific condition in all his import purchases moving from such ports during the term of this agreement. The Carriers shall use their best efforts to furnish vessels in their regular service collectively to carry such importations of the Lumber Merchant, such carriage in each case to be subject to the terms and provisions of the usual bill of lading of the respective Carriers at the time in use. "2. In consideration of the obligations on the part of the Lumber Merchant set forth in paragraph 1 hereof, and pursuant to the provisions set forth in the Carriers' published Conference tariff, each individual Conference member shall pay the Lumber Merchant the allowance provided in such Conference tariff to be made to the consignee signing this *112 freighting agreement upon such cargo as such member has delivered to the Lumber Merchant or to his order, but only when the provision in the tariff as to quantity and period of shipment has been strictly complied with. "Where traffic covered hereby is booked, offered and delivered for transportation in such quantities as to make the allowance herein provided applicable, but such shipments are not transported in the quantity and period provided in the carrier's published Conference tariff due to inability of the carriers to transport same during such period on account of lack of space or of force majure, the allowance shall be paid to the Lumber Merchant although the traffic in question may be handled outside the fifteen-day period provided in the tariff. Such allowance shall be due and payable at the end of each calendar month during the life of this agreement or as soon thereafter as may be practicable, but the Lumber Merchant shall be under no obligations, as set forth in paragraph 1 hereof, after the date of the termination of this agreement as herein provided." This contract was in effect and continued to operate during the taxable years ended May 31, 1940, 1941, and 1942, *113 here in issue. All lumber shipped by petitioner to Cuba became subject to this contract. All such lumber was consigned to "shipper's order, notify Luis Fernandez". Fernandez received and delivered the lumber to petitioner's customers in Cuba for whom it was destined, and received the checks given by the customers in payment therefor. The checks were made payable to petitioner and were sent it by Fernandez. Petitioner then deposited the checks in its bank account. None of the petitioner's lumber shipments was consigned to the Havana Lumber Company, or purchased by it. In order to obtain payment of the $2.50 refund provided by the contract he had executed with the Conference, Fernandez would send the Conference periodic statements showing the amounts of lumber shipped to him under the contract, date of shipping, name of Conference carrier, and amount of allowances due. The allowance checks were made payable to Fernandez and were mailed to him at Havana. When received by him he endorsed them and mailed them either to petitioner or to Olliphant and, in either case, they were deposited to the credit of the petitioner in its bank account. Petitioner carried on its books an account captioned, *114 "Havana Lumber Co., Havana, Cuba". The Conference allowance checks received through Fernandez were credited to this account by petitioner. This account also contained a few other credits representing collections of accounts. It also contained a credit item of $6,000 representing proceeds from sale of real estate received by Fernandez for the Havana Lumber Company. This latter amount was collected in cash and deposited in petitioner's bank account. An average of about $300 per month was debited to the account as expense, and covered the $150 per month salary of Fernandez and the salaries of two other employees in the Havana office, as well as miscellaneous expenses of that office. The Havana Lumber Company account showed total credits from Conference allowances received and total debits for salaries and miscelaneous expenses (but excluding debits representing transfers to petitioner's paid-in surplus and to G. R. Olliphant, which are set out hereunder in another tabulation) for the fiscal years involved herein, as follows: Excess of
Conference Allow-
Salaries and Miscel-
Allowances
Fiscal Year
ances Received
laneous Expense of
Received Over
Ended
and Credited
Office Debits
Debits
5/31/40
$10,402.97
$3,967.90
$ 6,435.07
5/31/41
9,991.22
4,549.33
5,441.89
5/31/42
9,940.57
5,554.03
4,386.54
TOTAL
$16,263.50
*115 The amounts which respondent determined in his deficiency notice to be additional income to petitioner from "Rebates or allowances" are in substantial agreement with the above amounts listed as "Excess of Allowances Received Over Debits". There is a variation of $100 for the year ended May 31, 1940, and of 20" for the year ended May 31, 1942, respondent having used the figures $6,535.07 and $4,386.74 for those respective years. The difference is apparently due to respondent's errors in addition. The "Havana Lumber Co." account on petitioner's books showed the following additional debits not included in the "Salaries and Miscellaneous Expense of Office Debits" listed in the above tabulation: Date
Debits
5-31-41
$ 6,322.68
Transferred to surplus paid in of petitioner
2-28-42
8,723.96
Transferred to surplus paid in of petitioner
3-16-42
3,239.34
Transferred to surplus paid in of petitioner
12-31-42
3,909.37
Credited to G. R. Olliphant
$22,195.35
The debits in this latter tabulation absorbed practically the total remaining credit balance in the "Havana Lumber Co." account. The transfers of those debits totalling $22,195.35 are in excess of the *116 allowances involved of $16,263.50 principally by reason of the fact that the Havana Lumber Company account also contained the credit of $6,000 derived from the sale of its real estate. The above items transferred on the "Havana Lumber Co." account to petitioner's "Surplus paid in" were so transferred at Olliphant's order because petitioner needed additional funds to do business. The item credited to G. R. Olliphant was received by him. Olliphant frequently made contributions to petitioner's paid in surplus in preference to raising needed additional capital. On one occasion he borrowed $6,000 on his home and contributed it to petitioner's paid in surplus. A portion of the Conference allowances shown in the first tabulation above as received in the respective taxable years, accrued in a fiscal year prior to that in which it was received by petitioner and entered on its records. Because of such prior accrual the amounts listed on that tabulation as "Excess of Allowances Received Over Debits" when adjusted to show the excess of allowances accrued over debits are as shown in the following tabulation: Fiscal Year
Ended
Ended
Ended
5/31/40
5/31/41
5/31/42
Excess of allowances received over debits
$6,435.07
$5,441.89
$4,386.54
Allowances accrued in year ended 5/31/39 - 2,511.41
Allowances accrued in year ended 5/31/40
2,065.69 - 2,065.69
Allowances accrued in year ended 5/31/41
1,059.75 - 1,059.75
Excess of allowances accrued over debits
$5,989.35
$4,435.95
$3,326.79
*117 The corporate minutes of petitioner provided that G. R. Olliphant should receive an annual salary of $10,000. During the taxable years involved he was paid an annual salary of $6,000. No resolution was ever adopted reducing his salary from $10,000 to $6,000 per annum. After the Conference contract was terminated his salary was increased to $15,000 per annum. Olliphant received no salary from the Havana Lumber Company during the taxable years. Under date of September 13, 1943 petitioner filed with respondent an "APPLICATION FOR RELIEF UNDER SECTION 722 OF THE INTERNAL REVENUE CODE", claiming a refund or credit of $3,483.96. The affidavit thereto was executed by G. R. Olliphant as petitioner's president and by petitioner's secretary. In the supporting schedules attached to the claim, petitioner stated as one of the reasons for abnormalities in its base period that: "(3) A change in the character of the taxpayer's business during the base period occurred when a change in management was made in May of 1938, with respect to its export business and in May 1939 with respect to its domestic business." This statement was amplified as follows: "(3) CHANGE IN MANAGEMENT "In May of *118 1938 the manager of the Cuban sales office, located in Havana, was replaced by a man with an entirely different attitude toward the conduct of that office. The former manager, who was the son of the President of the taxpayer corporation, was tempermentally unsuited to a situation calling for strict economy and constant attention to detail. "In May of 1939 the manager of the retail outlet for domestic sales of the taxpayer was replaced. "These changes in management made possible the realization of net profits not previously obtainable, but the full effect of the change was not realized prior to December 31, 1939. "In the case of both changes the new management initiated radical changes in policy that amounted to a change in the character of the business." The change in management of petitioner's Cuban sales office referred to in the foregoing claim was the employment of Luis Fernandez to replace the son of G. R. Olliphant. The allowances paid by the Conference to Luis Fernandez and by him remitted to petitioner were the income of petitioner, Fernandez acting in all respects with reference thereto as the employee and agent of petitioner. Opinion TYSON, Judge: The fundamental *119 issue presented involves determination of whether the allowances (referred to in the notice of deficiency as "rebates or allowances") which were paid by the Conference group of carriers and received by the petitioner in the respective taxable years constituted part of petitioner's taxable income for those respective years as determined by the respondent. The petitioner contends: (1) that in making the contract with the Conference and in his acts thereunder Fernandez acted on behalf of and for the Havana Lumber Company and its eomployee and agent; (2) that the allowances were not petitioner's income, but were the income of the Havana Lumber Company; and (3) that in receiving the allowances petitioner was merely acting as the banker of Havana Lumber Company, holding the allowances as trust funds. The respondent contends that the income is that of petitioner for the reasons: (1) that the Havana Lumber Company had no interest in the allowances, (2) that they were in fact earned by the petitioner, and (3) that the petitioner retained all of them except the portion diverted to the use of its president. The respondent further supports his allocation of this income to petitioner by the *120 authority given him under section 45 of the Internal Revenue Code. [1]
G. R. Olliphant, petitioner's president, owns all but three of its qualifying shares of stock. He is also the president of the Havana Lumber Company, a Cuban corporation, and owns all of its stock, except one share of qualifying stock held by his nominee, Luis Fernandez. The allowances involved herein were paid pursuant to a contract signed by the Conference of carriers and by Fernandez individually as consignee of the lumber shipped to Cuba by *121 petitioner. Olliphant first attempted to obtain the allowance contract with the Conference for petitioner or himself, but the Conference would not execute such a contract with either because, they stated, it would be illegal not only for the shipper but also for the carrier. Olliphant then considered having such contract executed by the Havana Lumber Company, but ultimately instructed Fernandez to execute the contract in Fernandez' individual name, and it was so executed. Olliphant repeatedly stated that Fernandez in the performance of all his services in Cuba including the signing of the contract and acting thereunder was not the employee of petitioner but was the employee of the Havana Lumber Company. However, when cross examined with reference to the nature of the services performed in Cuba by Fernandez, he stated that most of his services were connected with receiving and delivering petitioner's lumber shipments to its various purchasers in Cuba. These services of Fernandez are set out in detail in our findings and need not be repeated here. Olliphant's statements that Fernandez was not the employee of petitioner are also contradicted by statements in a claim for relief under *122 section 722 of the I.R.C. filed by petitioner. This claim was sworn to by Olliphant as president of petitioner and by petitioner's secretary. In support of the claim it was stated that the change of management of petitioner's business in Cuba occurring when Fernandez was employed and a change in the management of petitioner's domestic business "made possible the realization of net profits not previously obtainable". Olliphant's statements that Fernandez in executing the contract and in acting thereunder did so as the employee and on behalf of the Havana Lumber Company are also contradicted by further testimony of his. When cross examined on the absence of any power of attorney from the Havana Lumber Company, which he testified Fernandez did not have, Olliphant stated: "He [Fernandez] did it for himself; he was acting then for himself when he entered into the contract with the Steamship Conference". Olliphant testified that Fernandez never received any part of the allowances. From the above enumerated contradictions in the evidence it is clear that little reliance can be placed on Olliphant's statements that Fernandez was not an employee of petitioner but *123 was the employee of the Havana Lumber Company and had executed the contract with the Conference as the employee of and for the latter company. The significance of the fact that the allowances were credited on the books of petitioner to the account of the Havana Lumber Company as indicating that company's ownership of the allowances is nullified by the transfers from that account to petitioner's surplus of $18,285.98 and payment therefrom to Olliphant of $3,909.37. Such debits practically absorbed the total credit balance in the account remaining after the cost of operating the Havana office had been debited thereto. Disregarding the $3,909.37 credited to Olliphant, petitioner in its transfer on that account of $18,285.98 to its surplus received an amount in excess of the $16,263.50 in allowances here involved. Olliphant after testifying that he received no salary from the Havana Lumber Company further testified in attempted explanation of the transfers to petitioner's surplus and the payment to himself that; "I think it came to me as constructive income" for his services to the Havana Lumber Company as its president, and that for that reason they belonged to him at the time they *124 were so transferred and paid. Olliphant's testimony that the $22,195.35 constituting the total of the amounts transferred to petitioner's surplus and paid to him direct within a period from May 31, 1941 to December 31, 1942, constituted constructive receipt of such amount as compensation for his services as president of the Havana Lumber Company is not credible when it is shown by the facts herein that that company was practically defunct as a going concern in operating the lumber business in which it had theretofore been engaged, and that Olliphant only received a salary of $6,000 per annum from the very active petitioner. In the light of all the circumstances, we can not accept this explanation of how the allowances found their way into the surplus of petitioner and into the hands of Olliphant, but, on the contrary, think the entries on the account clearly show that petitioner received the credits to its surplus account directly from the Havana Lumber Company and exercised its ownership and control over the remaining balance by paying it to Olliphant personally. It may also be noted that there is nothing in the record showing what would be the reasonable value of such services as *125 may have been rendered the Havana Lumber Company by Olliphant. In our opinion it seems clear that petitioner in crediting the allowances to the Havana Lumber Company account was performing a mere formality and that the intention was that the allowances would never pass to the Havana Lumber Company, but would ultimately pass to petitioner. Crediting the allowances temporarily to the Havana Lumber Company on its account on the books of petitioner is consequently without significance as supporting petitioner's contention that such allowances were the property of the Havana Lumber Company. It may be further said that in view of the way the account of the Havana Lumber Company was handled on the books of the petitioner the debit to that account of the $150 per month paid to Fernandez is of little, if any, weight as indicating that Fernandez in the rendition of his services in Cuba, among which were the signing of the contract with the Conference and his acts thereunder, was acting as the agent and employee of the Havana Lumber Company; nor, for the same reasons, do the debits to that account of other office expenses justify a conclusion that the allowances here involved belonged to *126 the Havana Lumber Company. The facts show: that none of the lumber on which the allowances were paid under the Conference contract was shipped to or on account of the Havana Lumber Company and none of it was purchased by that corporation; that Fernandez was the ostensible "consignee" of that lumber under the contract which was signed in his individual name; that all the lumber was shipped "Shippers order notify" Luis Fernandez; that Fernandez received all such shipments as nominal consignee and delivered them with all necessary supporting papers to the purchasers of the lumber, collecting the proceeds therefrom and remitting those proceeds to petitioner; that upon and after the change in management of petitioner's Cuban office in 1938, Fernandez was in management of that office; that as consignee Fernandez collected and remitted to petitioner all allowances received by him under the Conference contract; that the larger part of Fernandez' activities in Cuba was performed for petitioner; that the allowances were actually received by petitioner and the greater portion thereof paid into its surplus account and a good portion thereof was paid to Olliphant under the direction of petitioner. *127 We think that these facts, when considered in connection with the other facts of record and the contradictions in the evidence above mentioned, force the conclusion that Fernandez in individually executing the Conference contract and in acting thereunder was acting as the employee of petitioner and not of the Havana Lumber Company. We hold, and have so found as a fact, that the allowances paid by the Conference to Fernandez and by him remitted to petitioner were the petitioner's income. In view of this conclusion it is unnecessary to consider the effect of section 45 of the Internal Revenue Code. The petitioner contends on brief, that if the allowances constitute income to the petitioner it is entitled to deduct such allowances as ordinary and necessary business expenses from its gross income as amounts accrued as a credit to the Havana Lumber Company and constructively received by Olliphant as compensation as president of that company. As regards petitioner's contention that the allowances were constructively received by Olliphant as compensation as president of the Havana Lumber Company we have commented on that suggestion above. However, even if it be assumed, *128 and without regard to such comment, that petitioner paid the allowances to Olliphant as compensation for services rendered by him to the Havana Lumber Company as its president, we can not conceive on what tenable theory the petitioner could pay the salary of the Havana Lumber Company's president and claim the amount thereof as a deduction from its own gross income, since the Havana Lumber Company, so far as the record shows, performed no services for petitioner in making the Conference contract or in carrying out the contract, or otherwise. The case of Edwin J. McEnaney, 3 T.C. 552, solely relied on by petitioner as an authority in support of this contention is not apposite, since in that case the amounts of the deductions allowed were apparently claimed in the pleadings and also were paid by the taxpayer to a subcontractor under a contract by which the taxpayer was obligated to pay the subcontractor certain sums as ordinary and necessary business expenses for services to be rendered by the latter to the taxpayer. It also may be noted that here no claim to the deductions is made in petitioner's pleadings. This contention of petitioner is without merit. Another contention *129 presented by petitioner on brief is that if the allowances are held to be income of the petitioner and are held not to be deductible as ordinary and necessary business expenses, then certain adjustments should be made in the amounts of the allowances added by respondent to petitioner's gross income for certain of the respective taxable years, because of the fact that petitioner was on the accrual basis, and certain portions of the allowances involved were accrued in a fiscal taxable year prior to that in which they were received by petitioner and included in his computation of the deficiency by the respondent. It appears from our findings that of the $6,435.07 received by petitioner from allowances in the fiscal year ended May 31, 1940 and added to petitioner's gross income by respondent for that taxable year, $2,511.41 accrued in the prior fiscal year ended May 31, 1939. Hence, the latter amount should be deducted from the $6,435.07 in computing the deficiency for the fiscal year ended May 31, 1940. However, $2,065.69 of the allowances received in the fiscal year ended May 31, 1941 accrued in the prior fiscal year ended May 31, 1940 and should be added to the amount accrued in the *130 latter year in computing the deficiency for that year. This adjustment gives a net amount of accrued allowances in the year ended May 31, 1940, of $5,989.35 instead of $6,435.07 as determined by respondent. Proper adjustments for the succeeding taxable years ended May 31, 1941 and 1942 give a net amount of accrued allowances in the year ended May 31, 1941 of $4,435.95 instead of $5,441.89 as determined by respondent, and in the year ended May 31, 1942 of $3,326.79 instead of $4,386.54 as determined by respondent. Decision will be entered under Rule 50. Footnotes
1. SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩